UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL PUBLIC RADIO, INC.**,<br>1111 North Capitol Street NE<br>Washington, DC 20002, and<br><br>**ROBERT BENINCASA,**<br>4405 Mariner Lane<br>Fairfax, VA 22033,<br><br>            **Plaintiffs,**<br><br>         **v.**<br><br>**FEDERAL EMERGENCY<br>MANAGEMENT AGENCY**,<br>500 C Street SW<br>Washington, DC 20024, and<br><br>**UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY**,<br>245 Murray Lane SW<br>Washington, DC 20528,<br><br>          **Defendants.** | **Case No. 17-cv-91**<br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF**<br><br>Freedom of Information Act,<br>5 U.S.C. § 552 |

## INTRODUCTION

1.　　Plaintiff National Public Radio, Inc., ("NPR") is a non-profit multimedia

organization that creates and distributes news, information, and other programming to a

nationwide network of independent radio stations.  In this suit under the Freedom of Information

Act ("FOIA") against the Federal Emergency Management Agency ("FEMA") and the U.S.

Department of Homeland Security ("DHS"), NPR seeks, for itself and the public it serves, basic

information about how FEMA runs a nationwide, multi-million-dollar disaster-relief program.

2.　　Under the federal Hazard Mitigation Grant Program ("HMG Program" or

"Program"), FEMA gives grants to state, tribal, and local governments for hazard-mitigation

measures after major disasters.  Those measures include acquiring eligible real property at risk of future disaster-related damage.  FEMA has spent hundreds of millions of dollars under the Program toward acquiring real property.  By statute, such a purchase should lead to restrictions both on the property's future use and on its eligibility for future federal aid.  To evaluate how well FEMA has carried out the Program's goals, spent those millions, and ensured compliance with those ongoing obligations, it is necessary to know the properties and sellers at issue.

3.      Seeking that information, NPR journalist Robert Benincasa (also a plaintiff) requested, under FOIA, the addresses of the properties purchased with Program funds, their Geographic Information System ("GIS") coordinates, and the names of the sellers.  FEMA maintains this information in an electronic database.  NPR requested this information to understand, and then share with the public, how FEMA operates this aspect of its HMG Program.

4.      FEMA denied the request in relevant part, asserting that the addresses, GIS coordinates, and seller names are all exempt from disclosure under FOIA Exemption 6, which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).

5.      Exemption 6 does not apply.  Any invasion of personal privacy would be, at most, *de minimis*, given that real-property sales—including addresses and sellers' names—are part of the internet-searchable public record and that participating in the voluntary Program is hardly cause for embarrassment or harassment.  Moreover, any such invasion would not be "clearly unwarranted," given the public's compelling need to know how FEMA runs the HMG Program.

6.      Plaintiffs seek to compel disclosure of the information that FEMA has withheld in violation of FOIA, and thereby vindicate the public's right "to know what their Government is up to." *NARA v. Favish*, 541 U.S. 157, 171 (2004) (internal quotations and citations omitted).

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction under 5 U.S.C. § 552(a)(4)(B) and

28 U.S.C. § 1331.

8.      Venue lies in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

**PARTIES**

9.      Plaintiff NPR is a non-profit multimedia organization and the leading provider of

non-commercial news, information, and entertainment programming to the American public.

NPR's fact-based, independent journalism helps the public stay on top of breaking news, follow

the most critical stories of the day, and track complex issues over the long term.  NPR achieves

those goals through traditional radio programming as well as its significant and growing

presence in digital media—including podcasts, mobile applications, and social media.  NPR's

programming currently airs on 1,077 public radio stations across the United States, reaching a

weekly audience of more than 28.8 million people, and NPR's digital properties receive more

than 14 million weekly unique visits.

10.     NPR has a demonstrated commitment to government transparency.  For example,

NPR journalists collected and analyzed government records about World War II-era chemical-

weapons testing to show, for the first time, that the U.S. Army conducted mustard-gas tests that

focused on race.  NPR journalists also analyzed government data to reveal how the Mine Safety

and Health Administration failed to collect millions of dollars in safety fines from coal-mine

operators, even as those operators continued to violate safety rules; that story prompted a federal

audit of the agency.  Most recently, NPR journalists, after sifting through police records, state

and federal court records, and documents obtained from the Federal Bureau of Prisons, identified

a prison in central Pennsylvania with a rate of inmate-on-inmate violence that is six times the

national average.

11.     Plaintiff Robert Benincasa is a computer-assisted-reporting Producer in NPR's

Investigations Unit, a group that undertakes both traditional journalistic fact gathering and data

analysis.  He reports on NPR Investigations stories, analyzes data for investigations, and

develops data visualizations and interactive applications for NPR.org.

12.     Defendant FEMA is a component of Defendant DHS and is responsible for

federal disaster-preparedness and response efforts.  Both FEMA and DHS are "agenc[ies]"

within the meaning of 5 U.S.C. § 552(f)(1).  FEMA and DHS have possession and control over

the records NPR seeks and are responsible for fulfilling NPR's FOIA request.

## STATUTORY FRAMEWORK

13.     "The basic purpose of FOIA is to ensure an informed citizenry, vital to the

functioning of a democratic society, needed to check against corruption and to hold the

governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214,

242 (1978).

14.     FOIA therefore requires federal agencies to release requested records to the public

unless an enumerated statutory exemption applies.  *See* 5 U.S.C. § 552(a)(3).  There are nine

such exemptions, 5 U.S.C. § 552(b)(1)-(b)(9), which "are explicitly made exclusive," *Milner v.*

*Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal quotation marks and citations omitted).  The

Supreme Court has "often noted the Act's goal of broad disclosure and insisted that the

exemptions be given a narrow compass."  *Id.* at 571.

15.     If an agency claims a statutory exemption, it must provide any reasonably

segregable, non-exempt information to the requester, specify the amount of information withheld,

and identify the exemption under which the withholding is made.  *See* 5 U.S.C. § 552(b).

Moreover, FOIA's "strong presumption in favor of disclosure places the burden on the agency to

justify the withholding of any requested documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).

16.     Relevant here, Exemption 6 renders FOIA inapplicable to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  (By contrast, Exemption 7(C) exempts information compiled for law-enforcement purposes merely if it "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C).)

17.     Exemption 6 does not apply where "no significant privacy interest is implicated." *Nat'l Ass'n of Retired Fed. Emps. (NARFE) v. Horner,* 879 F.2d 873, 874 (D.C. Cir. 1989).  And even if substantial privacy interests are implicated, Exemption 6 does not prohibit disclosure unless such interests "clearly" outweigh the public interest in opening agency action to the light of public scrutiny.  *News-Press v. U.S. Dep't Homeland Sec.,* 489 F.3d 1173, 1205 (11th Cir. 2007); *see also, e.g., U.S. Dep't of Justice v. Reporters Comm. for Freedom of The Press,* 489 U.S. 749, 762, 766, 772 (1989).  Thus, under Exemption 6, FOIA's presumption favoring disclosure "is at its zenith," and the balance is "tilted emphatically in favor of disclosure." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 37 (D.C. Cir. 2002), and *Stern v. Fed. Bureau of Investigation,* 737 F.2d 84, 91 (D.C. Cir. 1984), respectively.

18.     A FOIA requester who has completed the administrative appeal process has exhausted administrative remedies.  *See Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 61 (D.C. Cir. 1990).

19.     District courts have "jurisdiction to enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

## FACTUAL ALLEGATIONS

### A.      The HMG Program

20.      Congress established the HMG Program through the Robert T. Stafford Disaster

Relief and Emergency Assistance Act, Pub. L. No. 100-707 (1988), codified in relevant part at

42 U.S.C. § 5170c.  The Program is to fund measures that "are cost-effective" and "substantially

reduce the risk of future damage, hardship, loss, or suffering in any area affected by a major

disaster."  *Id.* § 5170c(a); *see also* https://www.fema.gov/hazard-mitigation-grant-program

("The purpose of the HMGP program is to help communities implement hazard mitigation

measures following a Presidential major disaster declaration.").  FEMA has, by regulation,

specified various requirements for receiving assistance through the HMG Program.  *See* 44

C.F.R. §§ 206.430-.440; *id.* §§ 80.1-.21.

21.      FEMA contributes HMG Program funds to the purchasing of flood-prone

properties through voluntary sales.  *See* 42 U.S.C. § 5170c(b)(1); *see also*

https://www.fema.gov/hazard-mitigation-grant-program ("Funds may be used to . . . purchase

property that has been subjected to, or is in danger of, repetitive damage."); 44 C.F.R. § 80.11(a)

(voluntariness requirement).  The amount paid to property owners for HMG Program property

purchases may be either the property's current market value or its market value before the

relevant disaster.  *See* 44 C.F.R. § 80.17(c)(1).  The pre-disaster value, however, is available only

for a seller who (1) owned the property at the time of the disaster and (2) is "a National of the

United States or [a] qualified alien."  *Id.* § 80.17(c)(4).

22.      Congress has specified that purchases of property with HMG Program funds may

be effected only after FEMA and an applicant for assistance have entered into an agreement that

includes two ongoing obligations.  First, the property must thereafter be "dedicated and

maintained in perpetuity for a use that is compatible with open space, recreational, or wetlands

management practices," which generally includes not building any new structure.  42 U.S.C.

§ 5170c(b)(2)(B)(i)&(ii).  Second, recipients of such HMG Program funds may not seek or

receive future federal disaster assistance, from "any Federal source," with respect to that

property.  *Id.* § 5170c(b)(2)(B)(iii).  Notice of these restrictions must be recorded with the

property's deed.  44 C.F.R. § 80.17(e).

23.     According to publicly available data reaching back to 2000, approximately $750

million has been spent acquiring property through the HMG Program.  *See*

http://www.fema.gov/media-library/assets/documents/85455.  As much as 75% of this amount

was spent by FEMA from federal funds.  *See, e.g.*, 42 U.S.C. § 5170c(a).

24.     FEMA's website includes an electronic dataset that contains some information

about the properties purchased through the Program.  But that dataset is incomplete.  With

respect to the location of each purchased property, FEMA has disclosed only the State, city, and

ZIP code.  And it has disclosed no information on the sellers of the properties.

25.     Without knowing the precise location of the properties and the identities of the

sellers, the public cannot evaluate, among other things, whether the properties were eligible for

purchase through the Program in accordance with § 5170c and applicable regulations; whether

any government officials have engaged in improper self-dealing; whether the sellers participated

voluntarily; whether the sellers received fair market value (or more, or less); whether sellers who

received pre-disaster market value were entitled to do so; whether the properties' subsequent

owners have been using them consistent with the applicable land-use restrictions; and whether

FEMA, other agencies, and funds recipients have complied with the restrictions on future federal

disaster assistance.

### B.      The FOIA Request

26.      On September 9, 2014, Mr. Benincasa submitted a FOIA request to FEMA seeking, among other things, "access to and copies of electronic database tables containing the data in the possession and/or control of FEMA in association with property acquisitions under the [HMG Program] or similar program(s)." Exh. A at 1.

27.      Mr. Benincasa sought this information on NPR's behalf in connection with a broader investigation of the Program, which yielded some surprising initial results about FEMA's use of funds for property acquisition. *See, e.g.,* Franklyn Cater & Robert Benincasa, *FEMA Is Buying Out Flood-Prone Homes, But Not Where You Might Expect*, NPR (Oct. 20, 2014), http://www.npr.org/sections/thetwo-way/2014/10/20/357611987/map-femas-buying-out-flood-prone-homes-but-not-where-you-might-expect (pointing out, among other things, that a surprisingly large portion of Program land purchases have occurred in inland States).

28.      In his request letter, Benincasa noted that "FEMA ha[d] released some fields from this dataset" through its website, but emphasized that "the dataset as released is incomplete." Exh. A at 1.  "Specifically," he explained, "it lacks basic public information about the property acquisitions, such as the address of the properties acquired, the sellers' names, . . . and the GIS coordinates of the properties." *Id.*  He requested a complete version of the dataset, including the aforementioned information fields. *See id.*

29.      The request letter emphasized, moreover, that Benincasa made the "request as a journalist" for NPR and that the information he requested would be "used by [NPR]" and would likely "contribute significantly to public understanding of the operations or activities of the government." *Id.*

### C.    Exhaustion of Administrative Remedies

30.    Eleven months later, FEMA denied NPR's request in relevant part.  The denial

letter asserted that "the addresses, the sellers' names, and the GIS coordinates [were] being

withheld pursuant to Title 5 U.S.C. § 552(b)(6)."  Exh. B at 1.  The letter provided a single

sentence of explanation:  "The privacy interests of the individuals in the records," it asserted,

"outweigh any minimal public interest in disclosure of the information."  *Id.* at 2.

31.    On September 21, 2015, NPR, through counsel, filed a timely administrative

appeal letter, in which it detailed why Exemption 6 does not apply.  *See* Exh. C.  In particular,

NPR pointed out that the requested information does not implicate privacy interests given that

real-estate transaction records "are already public records in every jurisdiction *and* nationally,

*and* are electronically searchable."  *Id.* at 4.  In addition, NPR emphasized that any minimal

privacy interest would be dwarfed by the public interest in access to information necessary to

enable "effective scrutiny of FEMA's administration of the HMG Program."  *Id.* at 5.

32.    Two months later, FEMA denied NPR's administrative appeal.  *See* Exh. D.  With

respect to FOIA, FEMA again relied exclusively on Exemption 6, asserting that "residential

addresses are exempt from disclosure" and "lists of names and addresses should be protected."

*Id.* at 1-2.

33.    The denial letter also invoked the Privacy Act, 5 U.S.C. § 552a, asserting that it

bars disclosure of the names and addresses of property owners.  Exh. D at 2.  FEMA did not

mention the Privacy Act's provisos that an agency may not "rely on any exemption in this

section to withhold from an individual any record which is otherwise accessible to such

individual under the provisions of [FOIA]," and that the Act's bar on disclosure does not apply

when "disclosure of the record would be . . . required under [FOIA]."  5 U.S.C. § 552a(t)(2) &

(b)(2), respectively.

### D.      Exemption 6's Inapplicability

34.      The information NPR seeks from FEMA about the HMG Program it runs does

not involve "personnel and medical files and similar files the disclosure of which would

constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).

35.      Contrary to FEMA's suggestion, Exemption 6 does not authorize blanket

withholding by agencies of names and addresses.  *See News-Press*, 489 F.3d at 1198 ("Congress

did not intend either names or addresses to automatically be withheld[.]").  Rather, "whether

disclosure of a list of names [or addresses] is a significant or a *de minimis* threat" to individual

privacy "depends upon the characteristic(s) revealed by virtue of being on the particular list, and

the consequences likely to ensue."  *Dep't of State v. Ray*, 502 U.S. 164, 176 n.12 (1991) (internal

quotation marks omitted).  And even if such disclosure does implicate a significant privacy

interest, Exemption 6 still does not authorize an agency to withhold that information where,

given the public interest in its disclosure, any invasion of personal privacy would not be "clearly

unwarranted."

36.      Here, disclosure would not implicate any significant privacy interest.  Property

addresses, GIS coordinates, and names of sellers of real property are neither "personnel and

medical files" nor "similar files."  5 U.S.C. § 552(b)(6).  Real-estate transaction records long

have been publicly available, including in searchable electronic form.  Indeed, on popular

internet websites (such as Zillow.com), information on the sale history, sale price, and names of

both sellers and buyers is usually just a few clicks away, available either directly on the website

or through links to governmental databases (which themselves are publicly available online).

37.     Disclosure will also reveal that the particular property sale happened to be done in connection with a voluntary federal property-protection program.  But given that the applicable future-use restrictions should be recorded with the deed, that information, too, may be discerned from public records.  *See* 44 C.F.R. § 80.17(e).  Moreover, no "injury and embarrassment" arises from an individual's association with such sale—by contrast to, for example, disclosure of having been the subject of a governmental investigation.  *U.S. Dep't of State v. Washington Post Co.,* 456 U.S. 595, 599 (1982).  Indeed, Congress in FOIA "disfavor[ed] privacy claims by those who receive a governmental benefit."  *News-Press,* 489 F.3d at 1202.

38.     Even if some more-then-*de minimis* privacy interest were implicated, it would be dwarfed by the "special need for public scrutiny of agency action that distributes extensive amounts of public funds in the form of subsidies and other financial benefits."  *Multi Ag Media LLC v. Dep't of Agriculture*, 515 F.3d 1224, 1232 (D.C. Cir. 2008).  Three-quarters of a billion dollars have been put toward property purchased through the HMG Program, and FEMA has a duty to ensure compliance with Congress's restrictions on future property use and federal aid.  *See* 44 C.F.R. § 80.5(a).  The public has a right to know whether those funds were and are being spent wisely and whether the Program is operating in accordance with the law.  *Cf. News-Press,* 489 F.3d at 1178 ("In light of FEMA's awesome statutory responsibility to prepare the nation for, and respond to, all national incidents . . . there is a powerful public interest in learning whether, and how well, it has met this responsibility.").  Yet the public cannot determine those things without information enabling it to identify the properties purchased and the sellers from whom they were purchased.  *See supra* ¶ 26.

39.     The light of public scrutiny is particularly needed in this area.  The HMG Program affords state and local governments considerable discretion, without much "oversight to

ensure that" spending is "conducted fairly" and lawfully.  Scott Gurian, *Investigation Reveals Sandy Energy Grant Program Riddled with Errors*, New Jersey Spotlight (Mar. 6, 2014), http://www.njspotlight.com/stories/14/03/05/sandy-energy-grant-program-riddled-with-errors/?p=all.  That combination of discretion with lack of oversight, the New Jersey Spotlight has suggested, leaves room for abuse through the use of funds on properties that, for example, "may not have even been directly affected . . . by [a] disaster."  *Id.*

40.     Indeed, DHS's Office of the Inspector General ("OIG") has repeatedly found mismanagement of HMG Program funds.  For example, in August 2016, the OIG found that "Mississippi did not provide proper oversight of a $29.9 million grant for the Hazard Mitigation Program."  DHS OIG, *FEMA Should Suspend All Grant Payments on the $29.9 Million Coastal Retrofit Program Until Mississippi Can Properly Account for Federal Funds*, OIG-16-115-D, at 1 (Aug. 10, 2016).  That grant had been intended "to help 2,000 Mississippi homeowners strengthen their homes against wind damages in future disasters," but OIG found evidence that the funds had been mishandled, and recommend suspending all related payments.  *Id.*  FEMA did not dispute that finding, and accepted OIG's recommendation.  *See id.*

41.     Further, OIG's annual audits of the HMG Program and related programs have revealed "significant issues representing millions of dollars."  DHS OIG, *Capping Report: FY 2013 FEMA Public Assistance and Hazard Mitigation Grant and Subgrant Audits*, OIG-14-102-D, at 2 (June 2014); *see, e.g.,* DHS OIG, *Summary and Key Findings of Fiscal Year 2014 FEMA Disaster Grant and Program Audits*, OIG-15-146-D, at 1 (Sept. 15, 2015) ("One Hazard Mitigation Grant Program audit resulted in $812 million of . . . potential monetary benefits.  We continue to find problems with grant management, ineligible and unsupported costs, and noncompliance with Federal contracting requirements.").  In particular, OIG has made "Frequent

Audit Findings" that the administration of the HMG Program and related programs has involved

"Improper Contracting Practices," "Unsupported Costs," "Poor Project Accounting,"

"Duplication of Benefits," "Excessive Equipment Charges," "Excessive Labor and Fringe

Benefit Charges," "Unrelated Project Charges," and "Unapplied Credits."  DHS OIG, *Audit Tips*

*for Managing Disaster-Related Project Costs*, OIG-16-109-D, at 5-12 (July 1, 2016).

42.     Because of the possibility of abuse and the evidence of program-implementation

issues, transparency is critical to maintain the public's trust that the government is acting in

accordance with the Program's goals and parameters.  The public has a strong interest in seeing

what the government is up to and how the federal dollars are being spent, and any potential

privacy interests are minimal given the nature of the records at issue.  Thus, Exemption 6 does

not apply and the requested records must be disclosed.

## CLAIM FOR RELIEF

### COUNT I

**Violation Of 5 U.S.C. § 552(a)(3)**
**For Failure To Release Non-Exempt Responsive Records**

43.     Plaintiffs re-allege and incorporate by reference paragraphs 1–42.

44.     Under 5 U.S.C. § 552(a)(3), agencies must disclose, upon request, all non-exempt

records not already subject to disclosure under paragraphs (a)(1) and (a)(2).  The agency must

make the records "promptly available to any person" as long as the request "reasonably describes

such records."  *Id.* § 552(a)(3).

45.     NPR submitted a FOIA request to FEMA that reasonably described the records

requested.  In particular, NPR requested FEMA's complete electronic dataset including the

addresses, GIS coordinates, and seller names for properties acquired through the HMG Program.

46.     FEMA refused to produce the complete dataset, citing FOIA Exemption 6.  *See* 5 U.S.C. § 552(b)(6).

47.     Exemption 6 does not apply.  The information NPR requested does not implicate any more than a *de minimis* personal privacy interest.  And any such interest is so insignificant that infringement thereon is "clearly [ ]warranted" in light of the public's compelling right to understand how FEMA has operated a nationwide, multi-million-dollar part of its HMG Program.

48.     Accordingly, FEMA violated 5 U.S.C. § 552(a)(3) by failing to produce the materials NPR requested.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

a.     Declare that FEMA's withholding of the requested records is unlawful;

b.     Order FEMA to make the requested records available to Plaintiffs;

c.     Award Plaintiffs their costs and reasonable attorneys' fees in accordance with 5 U.S.C. § 552(a)(4)(E); and

d.     Order such other relief as the Court may deem just and proper.

Dated:  January 13, 2017                    Respectfully submitted,

                                        */s/ C. Kevin Marshall*
                                        C. Kevin Marshall
                                        DC Bar No. 476266
                                        ckmarshall@jonesday.com
                                        Amanda K. Rice
                                        DC Bar No. 1019208
                                        JONES DAY
                                        51 Louisiana Ave., N.W.
                                        Washington, DC  20001
                                        Telephone: +1.202.879.3939
                                        Facsimile: +1.202.626.1700

                                        Peter C. Canfield
                                        Georgia Bar No. 107748
                                        JONES DAY
                                        1420 Peachtree Street, N.E.
                                        Suite 800
                                        Atlanta, GA  30309
                                        Telephone: +1.404.521.3939
                                        Facsimile: +1.404.581.8330
                                        pcanfield@jonesday.com

                                        *Attorneys for Plaintiffs*