**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL PUBLIC RADIO, INC., *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, *et al.*,<br><br>Defendants. | Civil Action No. 17-91 (BAH)<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

The plaintiffs, National Public Radio, Inc. ("NPR") and Robert Benincasa, a journalist at NPR, seek, under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, records from the defendants, Federal Emergency Management Agency ("FEMA") and U.S. Department of Homeland Security ("DHS"), regarding FEMA's Hazard Mitigation Grant Program ("HMGP"). Pls.' Mem. Supp. Mot. Summ. J. & Opp'n Defs.' Mot. Summ. J. ("Pls.' Opp'n") at 1, ECF No. 9-1. FEMA produced 66 documents in response to the plaintiffs' request, but withheld records relating to the names of HMGP sellers, as well as addresses and GIS coordinates of properties FEMA acquired through the program. The defendants invoked FOIA Exemption 6, which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), to justify these withholdings. After unsuccessfully appealing the defendants' withholdings, the plaintiffs filed this suit. The parties have now filed cross-motions for summary judgment. Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 8; Pls.' Cross-Mot. Summ. J. ("Pls.' Mot."), ECF No. 9. For the reasons stated below, the plaintiffs' motion is granted and the defendants' motion is denied.

## I.     BACKGROUND

Congress authorized the HMGP to "substantially reduce the risk of future damage, hardship, loss, or suffering in any area affected by a major disaster." 42 U.S.C. § 5170c(a). The program provides grants to states, Indian tribes, and private nonprofit organizations with hazard-mitigation plans that serve the program's goal of providing cost-effective risk reduction in designated disaster areas. *See id.*; 44 C.F.R. §§ 206.433, 206.434(a). FEMA administers the HMGP in conjunction with states, tribes, local governments, and private nonprofit organizations. 42 U.S.C. § 5170c(b)(1); 44 C.F.R. § 206.434(a). A permissible use of HMGP funds is the purchase of flood-prone properties, subject to certain requirements. 42 U.S.C. § 5170c(b)(1) (authorizing hazard mitigation assistance in connection with flooding); *see* 44 C.F.R. §§ 80.11(a) (requiring voluntary participation of the property's seller and restricting the use of eminent domain), 80.11(d) (requiring the applicant to retain full property interest), 80.17(c)(1) (requiring FEMA to pay either pre-disaster or current market value), 80.17(c)(4) (allowing FEMA to pay pre-disaster value only to a property owner who "own[ed] the property at the time of the relevant event" and is "a National of the United States or a qualified alien"). States and tribes thus may use grant funds to purchase properties that have been impacted by natural disasters. 42 U.S.C. § 5170c(b)(1). FEMA then publicizes, on its website, certain information related to the purchase. Pls.' Mot., Attach. 3, Decl. of Robert Benincasa ("NPR Decl.") ¶ 8, ECF No. 9-3.

Since 2000, the HMGP has distributed approximately $750 million to states and tribes that has been used to purchase over 10,000 properties, none of which has FEMA publicly identified by address, Geographic Information System ("GIS") coordinates, or seller. NPR Decl. ¶¶ 9–10, 12. FEMA only publicly identifies the state, county, city, and ZIP code of those properties obtained through HMGP grants. *Id.* ¶ 12.

2

Plaintiff NPR is a non-profit media organization that provides non-commercial news and information programming to the American public. *Id.* ¶ 3. NPR has used government records to publish news stories about government activities, including accounts of racially-selective World War II-era chemical weapons testing, the Mine Safety and Health Administration's failure to collect millions of dollars in safety fines from coal-mine operators, and the anomalously high rate of inmate-on-inmate violence in a central Pennsylvania prison. *Id.* ¶ 5.[1]

Plaintiff Benincasa is a Computer-Assisted-Reporting Producer in NPR's Investigations Unit, which performs traditional journalistic fact gathering as well as data analysis. *Id.* ¶¶ 1, 6. Benincasa learned of the HMGP during the fall of 2014, while investigating "options for coastal communities in light of sea levels." *Id.* ¶ 7. He discovered in the course of his research that the program had funded the purchase of many properties located in inland rather than coastal states. *Id.* ¶ 14. In addition, Benincasa discovered reports by DHS's Office of the Inspector General ("OIG") detailing numerous instances of HMGP mismanagement, including (1) overpayment of $146,617 to a Mississippi county due to use of an incorrect federal cost share rate, (2) expenditure of $929,379 in ineligible or unsupported project costs related to projects in a Louisiana parish, (3) the state of Louisiana's improper grant management, (4) FEMA's failure to establish periods of performance for each approved project, and (5) payment of duplicative benefits. *Id.* ¶ 27.

---

[1] The plaintiffs have attached these stories to their declaration as exhibits, *see* NPR Decl., Exs. A, B & C, ECF Nos. 9-5, 9-6 & 9-7. The full citations to these stories are: Caitlin Dickerson, *Secret World War II Chemical Experiments Tested Troops By Race*, NAT'L PUB. RADIO (June 22, 2015, 4:59 AM), https://www.npr.org/2015/06/22/415194765/u-s-troops-tested-by-race-in-secret-world-war-ii-chemical-experiments; Howard Berkes, Anna Boiko-Weyrauch & Robert Benincasa, *Coal Mines Keep Operating Despite Injuries, Violations And Millions In Fines*, NAT'L PUB. RADIO (Nov. 12, 2014, 3:35 PM), https://www.npr.org/2014/11/12/363058646/coal-mines-keep-operating-despite-injuries-violations-and-millions-in-fines; Christie Thompson & Joseph Shapiro, *Inside Lewisburg Prison: A Choice Between a Violent Cellmate or Shackles*, NAT'L PUB. RADIO (Oct. 26, 2016, 11:19 AM), https://www.npr.org/2016/10/26/498582706/inside-lewisburg-prison-a-choice-between-a-violent-cellmate-or-shackles.

Benincasa was "unable to meaningfully evaluate whether the HMG[P] [wa]s being operated consistent with the applicable legal constraints, whether the [p]rogram funds [we]re being spent wisely, and whether the [p]rogram [wa]s achieving its stated purpose of disaster mitigation," however, "[w]ithout knowing which properties have been purchased with HMG[P] funds or the identities of the individuals who sold them." *Id.* ¶ 21. Without this information, Benincasa could not determine whether (1) "FEMA [wa]s complying with applicable statutory and regulatory requirements in determining which property purchases to approve;" (2) "individuals who sold properties through the HMG[P] participated in the [p]rogram voluntarily;" (3) "individuals who sold properties through the HMG[P] received fair market value for their properties;" (4) "individuals who, in selling properties through the HMG[P], received pre-disaster market value were eligible to do so;" (5) "the properties have been used consistent with the applicable land-use restrictions;" (6) "FEMA, other agencies, and funds recipients have complied with the restrictions on future federal disaster assistance;" (7) "any governmental officials have engaged in improper self-dealing;" and (8) "FEMA (as well as state and local governments) has been spending its millions of dollars of HMG[P] funds in a way that is proportional to the risks of disaster that various eligible properties face." *Id.*

On September 9, 2014, Benincasa submitted a FOIA request to FEMA on NPR's behalf seeking "access to and copies of electronic database tables containing the data in the possession and/or control of FEMA in association with property acquisitions under the Hazard Mitigation Grant Program or similar program(s)." Defs.' Mot. Summ. J., Ex. A, NPR FOIA Request at 1, ECF No. 8-2. Although, as noted, FEMA publicly releases limited state, county, city, and ZIP code information in the dataset about HMGP property purchases, Benincasa pointed out that the publicly available information "lacks basic public information [about] the property acquisitions,

4

such as the address of the properties acquired, the sellers' names, the amount paid for the property and the GIS coordinates of the properties." *Id.* Benincasa also sought "documentation or meta-data associated with any and all data tables related to the dataset . . . includ[ing] but not . . . limited to any coding manuals, record layouts, relational models and data dictionaries, including all references to any fields withheld by FEMA in response to this request." *Id.*

FEMA's Disclosure Branch reviewed the request, conducted a search, and released 66 pages of documents to the plaintiffs eleven months after the initial request. Defs.' Mot., Attach. 1, Decl. of Eric Neuschaefer ("Defs.' Decl.") ¶ 4, ECF No. 8-1. In responding to the FOIA request, FEMA withheld the sellers' names, as well as the addresses and GIS coordinates of the properties they sold. *Id.* ¶ 7. Invoking Exemption 6, FEMA argued that "the names, addresses, and GIS coordinates do not shed additional light on how FEMA conducts property acquisitions under the HMGP, yet their release would likely subject these individuals to unwanted public scrutiny." *Id.* NPR filed a timely administrative appeal, Compl., Ex. C, Freedom of Information Act Appeal, ECF No. 1-3, which FEMA denied, Compl., Ex. D, Letter from Eric M. Leckey, Chief Admin. Officer (Acting), FEMA, to Peter C. Canfield, Esq. (Nov. 16, 2015), ECF No. 1-4. This suit followed.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Judicial Watch, Inc.*

*v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (quoting *Consumer Fed'n of Am. v. U.S.*

*Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006)). Indeed, the D.C. Circuit has observed that

"the vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of*

*the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

The FOIA was enacted "to promote the 'broad disclosure of Government records' by

generally requiring federal agencies to make their records available to the public on request."

*DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (citing *U.S. Dep't of Justice v.*

*Julian*, 486 U.S. 1, 8 (1988)). Reflecting the necessary balance between the public's interest in

governmental transparency and "legitimate governmental and private interests that could be

harmed by release of certain types of information," *United Techs. Corp. v. U.S. Dep't of*

*Defense*, 601 F.3d 557, 559 (D.C. Cir. 2010) (quoting *Critical Mass Energy Project v. Nuclear*

*Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc) (alterations omitted)), the

FOIA contains nine exemptions, set forth in 5 U.S.C. § 552(b), which "are explicitly made

exclusive and must be narrowly construed," *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565

(2011) (internal quotation marks and citations omitted); *see also Murphy v. Exec. Office for U.S.*

*Attys.*, 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens for Responsibility & Ethics in Wash. v. U.S.*

*Dep't of Justice (CREW)*, 746 F.3d 1082, 1088 (D.C. Cir. 2014); *Pub. Citizen, Inc. v. Office of*

*Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010). "[T]hese limited exemptions do not

obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act."

*Dep't of Air Force v. Rose,* 425 U.S. 352, 361 (1976).

In litigation challenging the sufficiency of "the release of information under the FOIA,

'the agency has the burden of showing that requested information comes within a FOIA

exemption.'" *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 185 F.3d 898, 904

(D.C. Cir. 1999) (quoting *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999)); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) (noting that "[t]he Government bears the burden of establishing that the exemption applies"); *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979) (finding that the agency invoking an exemption bears the burden "to establish that the requested information is exempt"); *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014). This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt from disclosure,'" while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur,'" *Pub. Citizen Health Research Grp.*, 185 F.3d at 904–05 (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

An agency may carry its burden of showing an exemption was properly invoked by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate. *See Judicial Watch, Inc.*, 726 F.3d at 215 ("In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" (alteration adopted) (quoting *Consumer Fed'n of Am.*, 455 F.3d at 287)); *CREW*, 746 F.3d at 1088 (noting that an agency's burden is sustained by submitting an affidavit that "'describe[s] the justifications for nondisclosure with reasonably specific detail, demonstrate[s] that the

information withheld logically falls within the claimed exemption, and [is] not controverted by either contrary evidence in the record nor by evidence of agency bad faith'" (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009))); *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (instructing that an agency's description "should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection[,] . . . [which] serves the purpose of providing the requestor with a realistic opportunity to challenge the agency's decision.") (internal citation omitted). While "an agency's task is not herculean" it must "'describe the justifications for nondisclosure with reasonably specific detail' and 'demonstrate that the information withheld logically falls within the claimed exemption.'" *Murphy*, 789 F.3d at 209 (quoting *Larson*, 565 F.3d at 862). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011)); *Larson*, 565 F.3d at 862 (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

The FOIA provides federal courts with the power to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). District courts must "determine *de novo* whether non-disclosure was permissible," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015), by reviewing the *Vaughn* index and any supporting declarations "to verify the validity of each claimed exemption." *Summers v. U.S. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). In addition, the court has an "affirmative duty" to consider whether the agency has produced all segregable, non-exempt information. *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842, 851 (D.C. Cir. 2010) (referring to court's "affirmative duty to consider the

segregability issue *sua sponte*") (quoting *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007));

*Stolt–Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("[B]efore

approving the application of a FOIA exemption, the district court must make specific findings of

segregability regarding the documents to be withheld.") (quoting *Sussman v. U.S. Marshals

Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007)); *Trans-Pac. Policing Agreement v. U.S. Customs

Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999) ("[W]e believe that the District Court had an

affirmative duty to consider the segregability issue *sua sponte* . . . even if the issue has not been

specifically raised by the FOIA plaintiff."); *see also* 5 U.S.C. § 552(b) ("Any reasonably

segregable portion of a record shall be provided to any person requesting such record after

deletion of the portions which are exempt under this subsection.").

## III.    DISCUSSION

FOIA's Exemption 6 allows an agency to withhold "personnel and medical files and

similar files the disclosure of which would constitute a clearly unwarranted invasion of personal

privacy."  5 U.S.C. § 552(b)(6).  Exemption 6 covers all "detailed Government records on an

individual which can be identified as applying to that individual," not merely one "a narrow class

of files containing only a discrete kind of personal information."  *U.S. Dep't of State v. Wash.

Post Co.*, 456 U.S. 595, 602 (1982); *see also Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir.

1999) ("The Supreme Court has interpreted the phrase 'similar files' to include all information

that applies to a particular individual.").

Determining whether a record's production "'would constitute a clearly unwarranted

invasion of personal privacy'" requires a court to "'balance the public interest in disclosure

against the interest Congress intended Exemption 6 to protect.'"  *Am. Immigration Lawyers

Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 673 (D.C. Cir. 2016) (quoting *Dep't*

*of Def. v. FLRA*, 510 U.S. 487, 495 (1994) (alterations omitted)).[2]  To calibrate these countervailing interests, a court first asks whether "'disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest.'"  *Id.* at 674 (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33 (D.C. Cir. 2002)).  The standard that courts use to determine whether production would implicate a substantial privacy interest "is not very demanding"—indeed, a "substantial privacy interest is anything greater than a *de minimis* privacy interest."  *Multi Ag Media, LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229–30 (D.C. Cir. 2008).  "If no significant privacy interest is implicated . . . FOIA demands disclosure."  *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989); *see also News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1200 (11th Cir. 2007) (observing that Exemption 6 protects "only [records] that bear any remote resemblance to information one might find in a medical or personnel record").[3]  If disclosure would implicate a substantial privacy interest, a court "weigh[s] the privacy interest at stake 'against the public interest in the release of the records.'"  *Am. Immigration Lawyers Ass'n*, 830 F.3d at 674 (quoting *Norton*, 309 F.3d at 33).  Notably, "a privacy interest may be substantial," yet nonetheless "insufficient to overcome the public interest in disclosure."  *Multi Ag Media*, 515 F.3d at 1230.

The sole dispute before the Court is whether Exemption 6 applies to the records at issue.[4]  As discussed more fully below, given the limited privacy interests and weighty public interests at

---

[2]    The defendants argue that the plaintiffs bear the burden of proof as to Exemption 6's applicability.  Defs.' Reply at 9.  Not so—an agency always bears the burden of proof to justify a withholding of records.  *Pub. Citizen Health Research.*, 185 F.3d at 904.  To be sure, a requester bears the burden to "show that revelation of the contents of the requested document would serve the public interest," *Associated Press v. U.S. Dep't of Justice*, 549 U.S. 62, 66 (2d Cir. 2008), but this is a burden of production that does not shift the federal agency's ultimate burden to justify withholding records under a FOIA exemption.  *See Pub. Citizen Health Research.*, 185 F.3d at 904.

[3]    Although *News-Press*, an Eleventh Circuit opinion, constitutes merely persuasive rather than binding authority, the case has been cited approvingly by the D.C. Circuit in an Exemption 6 case.  *See Multi Ag Media*, 515 F.3d at 1232.

[4]    The plaintiffs do not contest the search's adequacy.  Pls.' Opp'n at 9 n.3.

stake in disclosure of the requested records, as well as Exemption 6's pro-disclosure bent, the

balance of privacy and disclosure here weighs plainly in disclosure's favor.

### A. HMGP Sellers' Privacy Interests

The threshold issue in determining Exemption 6's applicability is whether production of

the records at issue would implicate a substantial privacy interest. *Am. Immigration Lawyers

Ass'n*, 830 F.3d at 673–74. The defendants argue that production would reveal HMGP sellers'

identities, former addresses, and finances, and expose sellers to solicitation by media

organizations and neighbors' jealousy, thus intruding upon the sellers' privacy. Defs.' Mem. at

6–9. The Court agrees that Exemption 6 cognizes these harms as personal privacy interests, and

that production of the records at issue would implicate privacy interests that are greater than *de

minimis*.[5] Nonetheless, the specific privacy interests that the defendants identify, though not *de

minimis*, are not weighty.

The defendants first point out that production would reveal HMGP sellers' identities in

connection with their former addresses. Defs.' Mem. at 6 (citing *FLRA*, 510 U.S. at 501;

*Horner*, 879 F.2d at 875). "[T]he privacy interest of an individual in avoiding the unlimited

disclosure of his or her name and address is significant . . . . In our society, individuals generally

have a large measure of control over the disclosure of their own identities and whereabouts."

*Horner*, 879 F.2d at 875; *see also FLRA*, 510 U.S. at 501 ("We are reluctant [in the FOIA

context] to disparage the privacy of the home, which is accorded special consideration in our

Constitution, laws, and traditions."). Nonetheless, "the disclosure of names and addresses is not

inherently and always a significant threat to the privacy of those listed;" whether such disclosure

---

[5]     While the plaintiffs deny that disclosure of an HMGP seller's former address would cause the seller any
embarrassment, Pls.' Opp'n at 11–13, even if this is correct, avoidance of embarrassment is not the only cognizable
privacy interest under Exemption 6.

11

constitutes "a significant or a *de minimis* threat to privacy depends upon the characteristic[s] revealed by virtue of being on the particular list, and the consequences likely to ensue." *Horner*, 879 F.2d at 877. In *FLRA*, production would have revealed employee' current addresses to labor unions, exposing employees to an unwanted "influx of union-related mail, and, perhaps, union-related telephone calls or visits." 510 U.S. at 501. As the Supreme Court recognized, "[m]any people simply do not want to be disturbed at home by work-related matters." *Id.* Production in *Horner* likewise could have revealed annuitants' current addresses, "interfer[ing] with the[ir] reasonable expectations of undisturbed enjoyment in the solitude and seclusion of their own homes" and exposing them "to an unwanted barrage of mailings and personal solicitations." 879 F.2d at 876 (quoting *Minnis v. Dep't of Agric.*, 737 F.2d 784, 787(9th Cir. 1984)). For these reasons, production of current addresses would have implicated privacy interests in both *FLRA* and *Horner*. Here, any infringement upon privacy interests that disclosure of HMGP sellers' former addresses would occasion is far more attenuated.

The defendants also cite the non-binding case of *Farnum v. U.S. Department of Housing & Urban Development*, 710 F. Supp. 1129, 1134 (E.D. Mich. 1988), which rejected the "proposition that there is significantly less of a privacy interest in a former address as opposed to a current address." Defs.' Mem. at 6–7 n.2. *Farnum* reasoned that disclosure of a former address implicates as great a privacy interest as disclosure of a current address because knowing one's former address may enable a person "to discover [one's] *current* address." 710 F. Supp. at 1134. In so doing, *Farnum* conflates the questions of (1) whether disclosure of a former address implicates any privacy interest and (2) that interest's magnitude. If disclosure of one's former address implicates privacy concerns only because a person could use such information to ascertain one's current address, this reasoning logically (and correctly) assumes that direct

disclosure of one's current address necessarily implicates a stronger privacy interest. Disclosure of a former address thus implicates a small, though not *de minimis*, privacy interest.

Next, the defendants posit that disclosure would entail privacy interests "because the information sought relates to individuals' personal finances." Defs.' Mem. at 8. Indeed, "individuals have a privacy interest in the nondisclosure of their names and addresses in connection with financial information." *Lepelletier*, 164 F.3d at 47. "When it becomes a matter of public knowledge that someone is owed a substantial sum of money, that individual may become a target for those who would like to secure a share of that sum by means scrupulous or otherwise." *Horner*, 879 F.2d at 876 (quoting *Aronson v. Dep't of Hous. & Urban Dev.*, 822 F.2d 182, 186 (1st Cir. 1987)). The defendants argue that production would reveal sensitive information about HMGP sellers' personal finances, including their receipt of "substantial sum[s] of money"—often in the millions of dollars—and, potentially, their financial distress, which a person might infer from a seller's acceptance of a low amount for her or his property, *see Multi Ag Media*, 515 F.3d at 1230 (observing that production of the records at issue "will in some cases allow for an inference to be drawn about the financial situation of an individual farmer."). Defs.' Mem. at 8. Two circumstances, however, limit the insight into an HMGP seller's finances that production would enable. First, the HMGP imposes no means-testing requirement for participation, and so does not suggest a seller's financial condition. *See News-Press*, 489 F.3d at 1200 ("[U]nlike many government benefits programs, such as welfare, Medicaid, and unemployment, one need not fall below a certain annual income level to qualify for disaster assistance."). Second, because production would reveal only a one-time receipt of payment for a single past sale of real property rather than a recurring receipt of benefits, a person could not infer whether the seller still has the sale money or is due to receive additional money.

*Cf. Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*,
554 F.3d 1046, 1051 (D.C. Cir. 2009) ("[W]e conclude that physicians have a substantial privacy
interest in the total payments they" continue to "receive from Medicare for covered services.");
*Horner*, 879 F.2d at 876 ("The list at issue here . . . indicates that each is retired or disabled . . .
and receives a monthly annuity check from the federal Government."). As with disclosure of
former addresses, disclosure of one's past receipt of a one-time payment for a past sale of real
property implicates a small, albeit not *de minimis*, privacy interest.

The defendants further contend that production would expose HMGP sellers to unwanted
solicitation from journalists. Defs.' Mem. at 7. Although disclosure of "names and addresses in
connection with financial information" is "particularly concern[ing] when the information may
be used for solicitation purposes," *Lepelletier*, 164 F.3d at 47, the defendants acknowledge that
contact by journalists investigating the HMGP is the only solicitation HMGP sellers reasonably
are likely to experience as a consequence of production. Defs.' Mem. at 7; Reply Supp. Defs.'
Mot. Summ. J. & Opp'n Pls.' Cross-Mot. Summ. J. ("Defs.' Reply") at 5–8, ECF No. 10. The
defendants have shown, at most, that some journalists may contact HMGP sellers, not that
HMGP sellers will experience a "barrage of solicitations" of the sort *Horner* characterized as a
significant privacy interest. 879 F.2d at 878. Moreover, "individuals are under no obligation to
speak to reporters, and on balance, the modest annoyance of a 'no comment' is simply the price
we pay for living in a society marked by freedom of information laws, freedom of the press, and
publicly-funded disaster assistance." *News-Press*, 489 F.3d at 1203. Indeed, because FOIA
requests almost always seek previously-unavailable information that sheds light on government
activities, the government's disclosure in every case may attract media interest. To allow an
agency to invoke Exemption 6 merely because the media might contact an individual in

connection with a produced record would bring a vast number of FOIA requests within Exemption 6's auspices, undermining FOIA's purpose of allowing "citizens to know what their Government is up to." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171 (2004) (internal citations and quotation marks omitted).

Finally, the defendants argue that production may incite jealousy in HMGP sellers' former neighbors who sustained property losses of their own, but either did not participate in the HMGP or else received less favorable HMGP payments than did other sellers, Defs.' Mem. at 8–9, an argument the plaintiffs do not dispute, *see generally* Pls.' Opp'n. The D.C. Circuit has acknowledged that the avoidance of jealousy is a cognizable privacy interest under Exemption 6, noting that "substantial privacy interests are at stake" where "disclosure of even favorable information may well embarrass an individual or incite jealousy." *Ripskis v. Dep't of Hous. & Urban Dev.*, 746 F.2d 1, 3 (D.C. Cir. 1984). HMGP sellers thus have a greater than *de minimis* privacy interest in avoidance of neighbors' jealousy.

The plaintiffs assert that disclosure would intrude little upon HMGP sellers' privacy interests because real estate transaction records—including information such as a property's sale history, sale price, and buyers' and sellers' identifies —are already publicly available in searchable form. *See* Pls.' Opp'n at 15 (citing NPR Decl. ¶ 19). Such records would include the fact that the defendants acquired property through the HMGP, because FEMA regulations require permanent recordation of purchased properties' future-use restrictions with the deed. Pls.' Opp'n at 15; *see* 44 C.F.R. §§ 80.17(e), 206.434(e)(1)(i)-(iii). Thus, the plaintiffs argue, "any given seller has no ground to expect that his or her involvement with that federal program will remain private," as a dogged investigator could conduct "a deed-by deed search of every property in every ZIP Code that has a property sold in connection with the [p]rogram." Pls.'

Opp'n at 15.  As the Supreme Court has recognized, "[a]n individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form." *FLRA*, 510 U.S. at 500.  To exclude from Exemption 6's ambit all information that is publicly available only in fragmented form, requiring an exhaustive search of voluminous records to uncover, would sharply limit Exemption 6's protection of personal privacy; indeed, "'in an organized society, there are few facts that are not at one time or another divulged to another." *Id.* (quoting *Reporters Comm.*, 489 U.S. at 763). The plaintiffs' own declaration concedes, moreover, that a deed-by-deed search of every Zip Code in which the defendants acquired property through the HMGP "would be effectively impossible given the sheer amount of data at issue."  NPR Decl. ¶ 19.  Indeed, the plaintiffs acknowledge that they cannot "identify, using publicly available records, which properties were purchased through the HMG[P], other than through a deed-by-deed search of each property in a ZIP Code," and that "even if such a search were feasible, it would not identify properties with respect to which, notwithstanding the requirements for the HMG[P], no deed restrictions were recorded." *Id.*  Thus, the information at issue, though public in a literal sense, is not so in any meaningful way. *See News-Press*, 489 F.3d at 1205 ("Although . . . it is possible to derive names from addresses through public records, we see no reason to enable this process with a ready-made list of names.").  Disclosure thus would intrude into HMGP sellers' privacy.

For these reasons, the defendants have met their "not very demanding" burden of showing that production of the records at issue "would constitute a 'more than minimal invasion of [HMGP sellers'] personal privacy,'" even if any "privacy interest that may exist" is not "particularly strong." *Multi Ag Media*, 515 F.3d at 1230 (quoting *Norton*, 309 F.3d at 35 (alterations omitted)).  This conclusion, however, is not dispositive.

### B. The Public Interest In Disclosure

The privacy interests that production of the records at issue would implicate must be balanced against the public interest in disclosure. *Am. Immigration Lawyers Ass'n*, 830 F.3d at 674. A record's production is in the public interest when "disclosure would serve" FOIA's "core purpose" of "'contributing significantly to public understanding of the operations or activities of the government.'" *FLRA*, 510 U.S. at 495 (quoting *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 775 (1989) (alterations and emphasis omitted)). "Official information that sheds light on an agency's performance of its statutory duties falls squarely within [FOIA's] statutory purpose." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 177–78 (1991) (quoting *Reporters Comm.*, 489 U.S. at 773). There thus is "a significant public interest in disclosure" of records that "will enable the public to more easily monitor whether [an] agency is carrying out its statutory duty." *Multi Ag Media*, 515 F.3d at 1232.

Disclosure of the records at issue would serve the public interest. The HMGP serves important public goals in "reduc[ing] or eliminat[ing] long-term risk to people and property from future disasters." *Hazard Mitigation Grant Program*, FED. EMERGENCY MGMT. AGENCY, https://www.fema.gov/hazard-mitigation-grant-program (last visited Nov. 21, 2017).[6] The defendants have, through the HMGP, purchased over 10,000 properties and expended hundreds of millions of public dollars. NPR Decl. ¶¶ 9-11. Production of the records sought would reveal at least three pieces of information regarding the defendants' management of the HMGP currently unknown to the public—the specific locations of properties purchased, the properties' individual purchase prices, and the identities of HMGP sellers. This information, valuable in

---

[6] Federal Rule of Evidence 201 allows a court to take judicial notice of "a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction; or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). Both of these conditions apply to a description of the HMGP found on the defendants' public website.

itself to enhance "public understanding of the operations or activities of the government," *FLRA*, 510 U.S. at 495 (emphasis omitted), also is necessary to enable "meaningful[ ] evaluat[ion] [of] whether the [HMGP] is being operated consistent with the applicable legal constraints, whether the [p]rogram funds are being spent wisely, and whether the [p]rogram is achieving its stated purpose of disaster mitigation."  NPR Decl. ¶ 21.

More specifically, the plaintiffs have identified eight aspects of the HMGP's operations on which disclosure would shed light: whether (1) the defendant complies with applicable legal requirements in determining which properties to acquire, (2) sellers participated in the HMGP voluntarily, (3) sellers received fair market value for their properties, (4) individuals who received pre-disaster market value for their properties were eligible to do so, (5) acquired properties have been used consistently with applicable land-use restrictions, (6) the defendants and funds recipients have complied with restrictions on future federal disaster assistance, (7) any government officials have engaged in improper self-dealing, and (8) HMGP funds have been spent in a manner proportional to the risks of disaster that various HMGP-eligible properties face.  *Id.*  The OIG's repeated identification of FEMA's mismanagement of the HMGP confirms the value of further public scrutiny of the defendants' administration of the HMGP.  *See id.* ¶¶ 27–28; *see also News-Press*, 489 F.3d at 1192 (crediting "evidence that FEMA's" program management "may have been plagued with fraud, waste, or abuse").[7]

This Court, like the Eleventh Circuit, "easily conclude[s] . . . that the asserted interest in learning whether FEMA is a good steward of" hundreds of millions of "taxpayer dollars in the

---

[7]    The defendants assert that the plaintiffs have not shown that any of the various OIG audits finding mismanagement of the HMGP "provide a basis to infer mismanagement with respect to the particular aspects of the HMGP at issue here" and overcome the "presumption of legitimacy" that courts "generally accord . . . official conduct."  Defs.' Reply at 12 (quoting *Ray*, 502 U.S. at 179).  To recognize, however, that an agency which has on past occasions mismanaged public dollars in the very program at issue here may have mismanaged public dollars in a different aspect of that program does not require a fertile imagination.

wake of natural and other disasters is one which goes to 'the core purpose of the FOIA, which is contributing significantly to public understanding of the operations or activities of the government.'" *News-Press*, 489 F.3d at 1192 (quoting *FLRA*, 510 U.S. at 495). "[T]here is a special need for public scrutiny of agency action that distributes extensive amounts of public funds in the form of subsidies and other financial benefits." *Multi Ag Media*, 515 F.3d at 1232; *see also Brock v. Pierce Cty.*, 476 U.S. 253, 262 (1986) ("[T]he protection of the public fisc is a matter that is of interest to every citizen."); *United States v. Suarez*, 880 F.2d 626, 630 (2d Cir. 1989) ("[T]here is an obvious legitimate public interest in how taxpayers' money is being spent, particularly when the amount is large."). In this regard, "the public interest in determining whether FEMA has been a proper steward of [hundreds of m]illions of taxpayer dollars is undeniable and powerful." *News-Press*, 489 F.3d at 1196. Production of the records at issue "will enable the public to more easily monitor whether [the defendants are] carrying out [their] statutory duty." *Multi Ag Media*, 515 F.3d at 1232; *see also Wash. Post Co. v. U.S. Dep't of Agric.*, 943 F. Supp. 31, 36 (D.D.C. 1996) ("A significant public interest lies in shedding light on the workings of [a federal agency] and the administration of [a] massive subsidy program.").

The defendants argue that "there is no countervailing public interest that would outweigh the strong privacy interests at stake here," citing *Ray*'s admonition that "[m]ere speculation about hypothetical public benefits cannot outweigh a demonstrably significant invasion of privacy." Defs.' Mem. at 9 (quoting *Ray*, 502 U.S. at 179). *Ray* is inapposite. That case spoke specifically to a requester's desire to conduct "a second series of interviews with [some] already-interviewed [subjects]," which "nothing in the record . . . suggest[ed] . . . would produce any relevant information that is not set forth in the documents that have already been produced." 502 U.S. at

179.  Here, in contrast, the records sought to be produced would not be duplicative, as the

defendants have not already disclosed them in any form.

The defendants also observe that "[t]he asserted public interest" that *Ray* rejected as

insufficient to require production stemmed "not from the disclosure of the redacted information

itself, but rather from the hope that respondents, or others, m[ight] be able to use that information

to obtain additional information outside the Government files." *Id.* at 178.  *Ray*, however,

expressly declined to adopt "a rigid rule" disregarding public interest in "'derivative use' of

requested documents," *id*, and the D.C. Circuit "takes derivative uses into account in evaluating

the impact of disclosure on the public interest," *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 15

(D.C. Cir. 2011).[8]  Indeed, the D.C. Circuit "recognize[s] that a relevant public interest could

exist where" records' production "might provide leads for an investigative reporter seeking to

ferret out what government is up to." *Painting & Drywall Work Pres. Fund, Inc. v. Dep't of

Hous. & Urban Dev.*, 936 F.2d 1300, 1303 (D.C. Cir. 1991) (quoting *FLRA*, 884 F.2d at 1452

(internal quotation marks omitted)); *see also ACLU*, 655 F.3d at 15 n.26 ("[D]erivative use may .

. . be considered where—as here—such use . . . will further FOIA's purpose of shedding light on

the operations and activities of government.").  Information that production of the records at

issue might enable the public to discern includes the eight categories of information identified

above.  *See* NPR Decl. ¶ 21.  The public has a right to know such aspects of "what their

government is up to." *Reporters Comm.*, 489 U.S. at 773.[9]

---

[8]       The defendants' reply brief asserts that *Ray* "rejected the plaintiffs' attempt to construct a public interest on
th[e] basis" that produced records might be used "to obtain additional information outside the Government files."
Defs.' Reply at 10 (citing *Ray*, 502 U.S. at 178).  As noted above, however, *Ray* reached this conclusion because the
records sought to be produced almost certainly would be duplicative of already-produced records.  By contrast, the
information sought here is unavailable in the public records.
[9]       The defendant also cites *McCutcheon v. U.S. Department of Health and Human Services*, Defs.' Mem. at 9,
which case concluded that "[a] mere desire to review how an agency is doing its job, coupled with allegations that it
is not, does not create a public interest sufficient to override the privacy interests protected by Exemption 7(C)."  30
F.3d 183, 188 (D.C. Cir. 1994).  *McCutcheon* is distinguishable for three reasons.  First, Exemption 7(C) sweeps

For these reasons, disclosure of the records at issue would serve weighty public interests.

## C. The Balance of Interests Weighs in Disclosure's Favor

To determine whether Exemption 6 applies to the records at issue, the privacy interests and public interests in disclosure that production would implicate must be weighed against one another. *See Multi Ag Media*, 515 F.3d at 1232 ("Having found both a greater than *de minimis* privacy interest and a significant public interest in disclosure . . . we must now balance the two to determine whether the agency has met its burden to show that the substantial interest in personal privacy is not outweighed by the public interest in disclosure." (internal quotation marks omitted)). Although production would entail a greater than *de minimis* infringement on personal privacy, that infringement would not be "clearly unwarranted," 5 U.S.C. § 552(b)(6), given the weighty public interest in understanding the defendants' administration of the HMGP.

FOIA's "presumption favoring disclosure . . . is at its zenith under Exemption 6," *Norton*, 309 F.3d at 37, which strikes "a balance tilted emphatically in favor of disclosure," *Stern v. FBI*, 737 F.2d 84, 91 (D.C. Cir. 1984) (internal quotation marks omitted); *see also Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 261 (D.C. Cir. 1982) ("Exemption 6['s] presumption in favor of disclosure is as strong as can be found anywhere in the Act."). "That presumption is of special force" where an agency uses the records at issue "in the administration

more broadly than Exemption 6, covering "records or information compiled for law enforcement purposes" the production of which "could *reasonably be expected to* constitute an *unwarranted* invasion of personal privacy," while Exemption 6 covers only "personnel and medical files and similar files the disclosure of which *would* constitute a *clearly unwarranted* invasion of personal privacy. 5 U.S.C. §§ 552(b)(6), (7)(C) (emphasis added). Thus, Exemption 7(C)—but not Exemption 6—protects records whose disclosure reasonably could, but would not definitely, constitute an invasion of privacy that is unwarranted, but not clearly so. Second, even if *McCutcheon* governed here, the plaintiffs have shown more than "[a] mere desire to review how [the defendant] is doing its job, coupled with allegations that it is not," 30 F.3d at 188, by identifying official reports by the defendants' own Inspector General finding mismanagement of federal programs that FEMA administers. *See* NPR Decl. ¶ 27. Third, the public interest in production is not limited to ferreting out government misconduct, but includes shedding light on "whether, and how well," the defendants have served their "awesome statutory responsibility to prepare the nation for . . . natural disasters." *News-Press*, 489 F.3d at 1178.

of its subsidy and benefit programs," given the "special need for public scrutiny of agency action that distributes extensive amounts of public funds in the form of subsidies and other financial benefits." *Multi Ag Media*, 515 F.3d at 1232. As such, "unless the invasion of privacy is clearly unwarranted, the public interest in disclosure must prevail." *Ray*, 502 U.S. at 177 (internal quotation marks omitted).

Here, the "undeniable and powerful," *News-Press*, 489 F.3d at 1196, public interest in shedding light on the defendants' administration of the HMGP outweighs HMGP sellers' weak privacy interests in nondisclosure of their names and of their former properties' addresses and GIS coordinates. *Multi Ag Media* is instructive. The D.C. Circuit recognized that production of "a massive database with information on crops and field acreage for hundreds of thousands of individual farms across the country," as well as "farm data on a digitized aerial photograph," would implicate "[a] substantial privacy interest," but nonetheless concluded that the public interest in disclosure "outweigh[ed] the personal privacy interest." 515 F.3d at 1226, 1229–30, 1233. In reaching this conclusion, *Multi Ag Media* cited (1) the agency's "rather tepid showing that release of the [records] would allow the public to draw inferences about some [program participants'] financial circumstances," (2) "the interest in [records] that would allow the public to more easily monitor [the agency's] administration of its subsidy and benefit programs," and (3) "FOIA's presumption in favor of disclosure." *Id.* at 1233. Each of these factors apply here: (1) the defendants have made a "rather tepid," *id.*, albeit sufficient, showing that production of the records at issue would intrude significantly upon HMGP sellers' privacy, *id.* at 1230, (2) production would enable the public to more easily monitor the defendants' administration of the HMGP, and (3) FOIA's pro-disclosure presumption applies here no less than in *Multi Ag Media*.

In a last gasp effort to protect certain withheld information, the defendants argue that HMGP sellers' identities should be exempt from disclosure even if records of their former properties' addresses and GIS coordinates must be produced, observing that *News-Press* concluded that Exemption 6 applies to individuals' names even while requiring production of those individuals' addresses. Defs.' Reply at 5. *News-Press* identified only one public interest that disclosure of disaster relief aid recipients' names would serve—"determin[ing] the extent of fraud against FEMA." 489 F.3d at 1205. *News-Press* reasoned that whereas "addresses go to the heart of whether FEMA improperly disbursed funds to property that sustained no damage, the names of disaster claimants are not as probative," because "[i]n the vast majority of cases where the name and address accurately reflect the property where the disaster claimant resides, the name of the disaster claimant would provide no further insight into the operations of FEMA." *Id.* (alterations omitted). As such, *News-Press* reasoned, "the convenience . . . of a ready list of names from which to research the extent of fraud against FEMA is outweighed by the increased privacy risks to those individuals of having the same ready list of names and addresses available to commercial solicitors, members of the press seeking quotes, and others." *Id.* Here, unlike in *News-Press*, disclosure of HMGP sellers' names would not only enable identification of fraud against the government—itself an important public interest—but would also assist the public in determining whether government actors have themselves committed fraud, coerced private citizens into selling their property, or paid sellers the full amounts they were due under the HMGP's terms. *See* NPR Decl. ¶ 21. Though HMGP sellers have a meaningful privacy interest in nondisclosure of their names, the public interest in disclosure, which is stronger here than in *News-Press*, outweighs those privacy interests.

For these reasons, although HMGP sellers have a substantial privacy interest in nondisclosure of their names and their former properties' addresses and GIS coordinates, those privacy interests are outweighed by the public interest in disclosure of this information. As such, production of the records at issue would not "constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).[10]

## IV. CONCLUSION

The plaintiff's motion for summary judgment is granted, and the defendant's motion for summary judgment is denied. An appropriate Order accompanies this Memorandum Opinion.

**Date:** November 21, 2017

_____
BERYL A. HOWELL
Chief Judge

---

[10] The plaintiffs argued in their opposition that the defendants cannot establish any privacy interest with respect to sellers of property that are not natural persons. Pls.' Opp'n at 16; *see Multi Ag Media*, 515 F.3d at 1228-29 ("[B]usinesses themselves do not have protected privacy interests under Exemption 6, . . . . Exemption 6 applies to financial information in business records [only] when the business is individually owned or closely held, and the records would necessarily reveal at least a portion of the owner's personal finances." (internal quotation marks omitted)). Conceding in their reply that Exemption 6 applies only to natural persons, the defendants have made a supplemental production of records to the plaintiffs consisting of HMGP data on sales by non-natural persons, and now argue that the plaintiffs' arguments concerning information pertaining to non-natural persons are moot. Defs.' Reply at 9; Defs.' Reply, Attach. 1, Suppl. Decl. of Eric Neuschaefer ¶ 3 ECF No. 12-1. The plaintiffs counter that the defendants' disclosures are deficient, as they omit data pertaining to "Type of Residency," "Structure Type," and, for over 30% of records in the defendants' supplemental production, "Price Paid," which the defendants' publicly-released spreadsheets contain. Reply Supp. Pls.' Cross-Mot. Summ. J. ("Pls.' Reply") at 10, ECF No. 13; *compare FEMA HMGP Property Acquisitions*, FED. EMERGENCY MGMT. AGENCY, https://www.fema.gov/media-library/assets/documents/85455 (download required) (last visited Nov. 17, 2017), *with* Pls.' Reply, Ex. A, Defs.' Supplemental Disclosure, ECF No. 13-1. The defendants provide no explanation for these omissions. Accordingly, the defendants must either produce the omitted information or provide "a 'reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched.'" *DiBacco*, 795 F.3d at 188 (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999)).